ISAAC S. WILSON *v.* UNION MUTUAL FIRE INS. CO.

January Term, 1903.

Present: TYLER, MUNSON, START, WATSON and HASELTON, JJ.

Opinion filed June 4, 1903.

*Fire insurance policy—Construction—Condition—Steam farm engine—Use—Pleading.*

When a fire insurance policy prohibits the use of a "steam farm engine" within a certain distance of the buildings insured,—there being no such type or style of engine,—the use, within the prohibited distance, of any steam engine adapted to all farm purposes for which an engine can be used, vitiates the policy.

The fact that the policy covered other engines, located on the premises as described therein, did not justify the use of the engine here complained of.

The engine was being "used" within the meaning of the policy, since its use was as permanent as the character of the work required. This defense can be made under a notice, without a special plea.

GENERAL ASSUMPSIT on a fire insurance policy. Plea, the general issue with notice of special matter. Trial by jury at the September Term, 1902, Orleans County, *Haselton,* J., presiding. Defendant's motion for a verdict overruled. Verdict and judgment for the plaintiff. The defendant excepted.

*Young & Young* for the defendant.

The use of the engine within sixty-eight feet of the buildings insured vitiates the policy, and a verdict for the defendant should have been ordered.

It increased the risk, and the provision of the policy was a reasonable one. *Finley* v. *Insurance Co.,* 74 Vt. 211; *Esterbrooks* v. *Company,* 52 Atl. 1048; *Church* v. *Insurance Co.,* 158 Mass. 475; *Davis* v. *Insurance Co.,* 81 Ia. 496; *Lyman* v. *Insurance Co.,* 98 Mass. 329; *Marion* v. *Insurance Co.,* 21 Pick· 162; *Dittmer* v. *Insurance Co.,* 8 Am. Rep. 600.

This engine was a "steam farm engine," because it was adapted to all purposes for which an engine can be used on a farm. The meaning of this term as used in the policy was a question for the Court. *Eaton* v. *Smith,* 20 Pick. 150; *State* v. *Stevens,* 69 Vt. 411; *Mixer* v. *Reed,* 25 Vt. 254; *Magoon* v. *Harris,* 46 Vt. 264; *Wood* v. *Railroad Co.,* 24 Vt. 608; *Wead* v. *Marsh,* 14 Vt. 80; *State* v. *Abbott,* 20 Vt. 537.

*J. W. Redmond* for the plaintiff.

It was not error to submit to the jury the question whether the engine was a "steam farm engine." *Brown & Co.* v. *Mc-Gran,* 14 Pet. 479; *Lucas* v. *Groning,* 7 Taunt. 164; *Darling* v.·

*Dodge,* 36 Me. 370; *Enos* v. *Insurance Co.,* 67 Cal. 621; *Insurance Co.* v. *Favorite,* 46 Ill. 263; *Carrigan* v. *Insurance Co.,* 53 Vt. 418; *Mosley* v. *Insurance Co.,* 55 Vt. 142.

Under the act of 1896, this defense must be raised by a special plea.

The engine was not being "used" within the meaning of the policy.    The policy is to be construed against the Company. *Brink* v. *Insurance Co.,* 49 Vt. 457; *Mosley* v. *Insurance Co.,* 55 Vt. 142.

Use means *habitual use.    Dobson* v. *Sotheby,* 22 E. C. L. 481; *Smith* v. *Insurance Co.,* 30 L. R. A. 368; *Mears* v. *Insurance Co.,* 37 Am. Rep. 647; *Insurance Co.* v. *Mayer,* 97 Pa. St. 441; *Bentley* v. *Insurance Co.,* 43 Atl. 209; *Adair* v. *Insurance Co.,* 45 L. R. A. 204; *Brink* v. *Insurance Co., supra.*

The use of this engine was warranted since the policy expressly contemplated the use of engines on the premises. *Mascott* v. *Insurance Co.,* 69 Vt. 116.

TYLER, J.    This action is brought upon an insurance policy to recover for the loss of the plaintiff's farm buildings and the personal property therein, that were insured by defendant company, which property was afterwards destroyed by fire. Plea, the general issue and notice of special matters in defense. The notice alleges that the policy contained the condition, among others, that using "a steam farm engine" within one hundred feet of any building insured should render the policy void, unless the consent of the company, in writing, duly certified by the Secretary, was given; that prior to the fire the plaintiff placed within one hundred feet of the buildings insured a steam farm engine with boiler and fire box attached, and built fires in the fire box, and operated the engine within that distance of the buildings insured, and continued to operate and use it there until the time of the fire, without the defendant's

consent, and in violation of the contract, and that the policy was thereby rendered void.

On the trial in the Court below the parties agreed that the question whether the fire was communicated from the engine to the buildings destroyed need not be submitted to the jury, and the Court instructed the jury that under the by-laws of the Company it was immaterial whether the fire was so communicated or not.

The plaintiff concedes in his brief that he placed and used the engine in question within the prohibited distance, but contends that it was not a steam farm engine as described in the policy.

Both parties admitted in argument that there was no class or kind of engines known as "steam farm engines," and that the by-law referred to prohibited the use of no other steam engines within the distance prescribed.

The defendant introduced no evidence tending to show what a steam farm engine was, but claimed that any engine that was adapted to general use for farm purposes answered the description in the policy.

The undisputed evidence was that this was an upright, portable engine; that it was originally purchased to draw logs from the river and for use about a mill, but for several years had been used alternately in drawing logs and to furnish power for cutting ensilage and filling silos, and had been used upon several farms for the latter purpose. An engineer called by the defendant as a witness testified that he had run the engine, and that it was adapted to all farm purposes where only a small amount of power was required, such as running a threshing machine, a circular saw for sawing wood, and a separator in a creamery. The plaintiff did not controvert this testimony further than to claim that the engine was not well adapted to

threshing grain, because it could not be set near enough to a barn to be used with safety. For anything that appeared in the evidence, this was true of any fire engine. Any engine would need to be placed a safe distance from the barn, and sufficient belting used to operate the machine. This engine was stationed about seventy feet from the barn when it was operating the ensilage cutter at the time of the fire. The plaintiff testified that he did not consider this a steam farm engine; that he had one that was insured in this policy that he called such an engine; but he did not point out any superior qualities that his engine possessed over the one in question. We infer that some other engine was better adapted to use in the creamery than was this, but the fact that another engine was more suitable than this for some purposes is not determinative that this was not a steam farm engine; nor, on the other hand, would the fact that this engine *could* be used for all farm purposes, but was unsuitable and could be used only at disadvantage, bring it within the terms of the policy.

But this is the true view: Both parties to the contract of insurance must have had in mind some kind of a steam engine, the use of which within one hundred feet of the buildings was prohibited, because such use exposed the buildings to fire. The exposure to fire was the obvious reason of the prohibition. It is conceded that there was no such class or kind of engines as the one named in the policy. There was no evidence tending to show that there was any engine better adapted than this to general use upon a farm. It appeared that it was a "general purpose" engine for a farm, as one witness described it without contradiction. There was no claim made that it did not furnish sufficient power for all purposes, so the most that could be said upon the evidence in support of the plaintiff's contention was that another kind of engine was more convenient than

this for certain uses. So we think that the one in contro-versy may reasonably be considered as within the contemplation of the parties when the contract was made, and within the meaning of the term employed.

Upon the undisputed facts, it was error in the trial Court to submit the case to the jury. This holding is not at variance with any case decided by this Court. In *Carrigan* v. *Ins. Co.,* 53 Vt, 418, 38 Am. Rep. 687, upon which the plaintiff relies, it was held that the question whether benzine was a drug should have been submitted to the jury, the Court saying that according to Webster's Dictionary a drug included any min-eral substance used in chemical operations; that the trial Court could not say as matter of law that benzine was not included in that term, and that the question should have gone to the jury. In *Mosley* v. *Ins. Co.,* 55 Vt. 142, it was properly held that the question whether gin and turpentine fell within the denom-ination of inflammable liquids, as used in an insurance policy, was for the jury to determine, and that the Court could not take judicial notice of the fact that they were inflammable. In the present case the trial Court was not required to take judi-cial notice of any fact in relation to the engine. It *appeared* that it was a *portable steam engine* of four and a half horse power, and the undisputed evidence showed it to be adapted to all purposes for which a steam engine could be employed upon a farm. If there had been evidence tending to show that an-other kind of engine was better adapted to general farm pur-poses than this one, nevertheless, this was a steam farm engine; but there was no such evidence.

As the term "steam farm engine," is not the name of any pattern or style of engine, the words must be understood in their ordinary sense as descriptive of any engine adapted to farm purposes. Courts will take notice of the meaning of

English words and terms of art according to their ordinary acceptation. 1 Chit. Pl. 223. And words are to be given their common and ordinary meaning, unless it appears from the context that their meaning should be limited or enlarged. It was held in *Weed* v. *Marsh,* 14 Vt. 80, that the trial Court correctly held that the term "fulled cloth" was understood in common parlance to mean "woolen fulled cloth." In *State* v. *Abbott,* 20 Vt. 537, an indictment alleging the wounding and maiming of a "red three year old steer," was held sufficient under a statute against maiming or wounding cattle. Several cases are cited by the defendant where holdings of trial Courts that certain articles were or were not "tools," had been sustained under statutes exempting certain personal property from attachment,—among them is *Allen* v. *Thompson,* 45 Vt. 472, where the holding was sustained that a barber's chair and foot rest were "tools" within the meaning of the statute. *State* v. *Bowman,* 6 Vt. 594, was an indictment for having a crucible in the respondent's possession for the purpose of counterfeiting. The question upon the demurrer was whether the crucible described in the indictment was included in the statute which makes it a penal offense for a person to have in his possession any die, stamp, or other instrument or tool for the purpose of forging or counterfeiting. There is no intimation by Court or counsel that the question was not one for the Court rather than the jury, to decide.

A printed schedule is attached to the policy which includes most of the property insured; but several items are in writing, and among them is, "$50 on engines, shafting, and belting."

It appears by the diagram that the boiler-house in which the boiler that propelled these two engines was placed, was within 100 feet of the buildings insured, and the plaintiff contends that the defendant must have contemplated in the con-

tract of insurance that these engines would be used for ordinary farm purposes, and that the written part of the contract must be construed to control the printed prohibition, within the rule in *Mascott* v. *Ins. Co.*, 69 Vt. 116, 37 Atl. 255. There the insurance covered a building "occupied for a storehouse and paint shop,"—a clause in the policy declaring that it should be void if benzine was "kept, used, or allowed upon the premises." The fire was caused by the use of benzine mixed with asphaltum in the paint shop, and it appeared that benzine was an article necessarily used in a paint shop; *held,* that it must be presumed that, when the defendant made the contract of insurance upon the building and authorized its use as a paint shop, it was acquainted with the business usually carried on there and the materials used, and that the written portion of the policy in this respect was intended to control the printed portion.

If the question in the present case were in respect to the use of the engines insured, the contract would be construed to mean that their use was contemplated by the defendant, in view of their situation and the safeguards around them and the boiler for protection against fire from their use. But the engine in controversy was not insured, was not upon the premises when the contract was made, and when used it had not the protection of a boiler-house, but was placed, with its boiler attached, upon trucks in the open field; therefore *Mascott* v. *Ins. Co.* does not control the present case. The written words in the policy insuring "engines, shafting, and belting," related to the engines then upon the premises, and presumably guarded in a manner that the defendant's agents could see and understand and that was satisfactory to them when they made the contract.

The plaintiff contends that he was not "using" the engine within the meaning of the term as employed in the by-laws; that the word means habitual use. Several cases are cited in which questions are discussed and decided, whether certain alterations in or uses of buildings insured invalidated the contract, and whether the keeping of certain commodities in buildings insured rendered the policy void. But each case must be determined upon its own peculiar facts, and assuming, though not deciding, that the general rule is as the plaintiff claims, the facts in this case do not support his contention that the use was not permanent, for it appeared that he borrowed the engine eight to ten days before the fire; that he used it two and a half to three days in filling his silo, and then moved it to another farm of his, and used it there about the same length of time for the same purpose; that it was idle four or five days when he moved it back to substantially the same place where it first stood, to complete the filling of the first silo, which would require two and a half or three hours' time.

Applying a liberal rule of construction to the word "using," as employed in the restrictive clause, we think the use of the engine was in violation of the contract. Its use was as permanent as the work of filling the silo required, and the use evidently was dangerous.

The defense was properly made under the general issue and notice, without a special plea alleging a violation of the contract. V. S. 1149. *Holdridge* v. *Holdridge's Estate,* 53 Vt. 546; *Worthen* v. *Dickey,* 54 Vt. 277.

*Judgment reversed and cause remanded.*